JAMES H. CAMPBELL v. GREEN B. GREER, Appellant.

Division Two, February 18, 1908.

1. **LIMITATIONS: Thirty Years: Instruction.** Where the Government's title emanated in 1850, and plaintiff's father acquired the patentee's title in 1871 and no taxes were paid by either prior to the bringing of the suit in 1903, and neither was in possession at any time, the court should have given an instruction allowing a defendant, who had been in lawful possession for one year,' to recover, under the thirty-year Statute of Limitations (Sec. 4268, R. S. 1899); for, not only had the thirty years without possession and the payment of taxes expired, but the one year thereafter allowed in which to bring the suit had also expired.

2. ——: ——: **Payment of Taxes: Evidence.** Testimony by plaintiff that his father had a tax receipt, but he did not read it or hear it read or know what land it described, that his stepmother he thought had the receipt but she either could not find it or would not look for it, is unsatisfactory evidence to show that the taxes were paid in 1874, especially when met by the tax-books showing the land delinquent for the years 1872 to 1879 inclusive.

3. ——: ——: **Vesting Title.** Under the thirty-year Statute of Limitations (Sec. 4268, R. S. 1899), the title of a plaintiff who has failed to meet its conditions vests *ipso facto* in thirty-one years in a defendant who has had lawful possession for one year.

4. ——: ——: **Equitable Titles.** The provisions of the thirty-year Statute of Limitations (Sec. 4268, R. S. 1899), apply to legal as well as to equitable titles which have emanated from the Government.

5. ————: ————: **Substantial Evidence: Refused Instruction.** Although there may have been substantial evidence that taxes had been paid during the thirty-year period, yet if the finding of the court sitting as a jury was general for plaintiff, its refusal to give an instruction asked by defendant which invoked the thirty-year limitation, was error, the evidence developed at the trial showing a state of facts that made the instruction entirely applicable to that pleaded issue. The refusal of the instruction indicates that the court did not consider that issue.

Appeal from New Madrid Circuit Court.—*Hon. H. C. Riley*, Judge.

REVERSED AND REMANDED.

*Russell & Deal* for appellant.

*L. W. Fisher* and *J. V. Conran* for respondent.

FOX, P. J.—The defendant has perfected the abstract of record in this cause in compliance with the opinion of this court heretofore filed herein, 197 Mo. 463. From the record thus perfected it appears that plaintiff instituted this suit returnable to the March term of the circuit court of New Madrid county, the purpose of which is to have ascertained and determined the interests of the parties to forty acres of land in that county.

The petition is the usual one under section 650, Revised Statutes 1899.

By answer, defendant admits that he claims to be the owner of the land and denies each and every other allegation of the petition. As a second defense he pleads adverse possession for the period of ten years and thereby invokes the ten-year Statute of Limitations. The third and last defense is couched in this language: "Further answering, defendant avers that the land described in plaintiff's petition has not been in the possession of the plaintiff or any one under

whom he claims or might claim for thirty consecutive years, and that said plaintiff nor those under whom he claims or might claim have paid any taxes for all that period of time on said land and that said defendant is in the lawful possession of said land and has been for more than one year from the date of the expiration of said period of thirty years.    Wherefore, premises considered, defendant prays judgment and for costs.''

The reply denies generally each and every allegation of new matter in the answer contained, and specifically denies the plea of adverse possession for ten years.    Such are the issues made by the pleadings.

Plaintiff's evidence offered in chief consisted of records and his individual evidence and that of one David Wilkerson. It was admitted that the title passed from the United States Government to the State of Missouri by Act of Congress, September 28, 1850; and from the State to New Madrid county, October 1, 1875. The record title thereafter passed by *mesne* conveyances until it reached Levi Mayhew, March 19, 1870. At this point the following offer of a deed and ruling was made:

"Plaintiff offered the deed from Levi Mayhew to James McHenry Campbell conveying the land in controversy, dated April 26, 1871, recorded in book 23, page 279. This deed was not acknowledged by Levi Mayhew and the acknowledgment of his wife was before a justice of the peace in Lauderdale county, Tennessee.

"Defendant objected to the introduction of said deed because it was not acknowledged by one of the parties and the other grantor acknowledged the same before a justice of the peace in another State. The court overruled the objection, to which defendant excepted.''

Plaintiff then offered a quitclaim deed, for which he paid one dollar, from Sarah Campbell, widow of

James McHenry Campbell, to W. H. and James Campbell, the plaintiff, of date January 13, 1903, and also a quitclaim deed from W. H. Campbell to himself of date January 15th, 1903. The plaintiff and Wilkerson testified as follows, as taken from the abstract of record:

"James M. Campbell, the plaintiff, testified in substance as follows: I claim to own the northeast quarter of northwest quarter of section 17, township 25, range 13, in New Madrid county, Missouri. James McHenry Campbell was my father. He died on the 9th of September, 1902, and left as his only heirs myself, my brother, W. H. Campbell, and my stepmother, Sarah Campbell. I have a deed from Levi Mayhew to my father.

"CROSS-EXAMINATION: I am thirty-six years old. I visited this land last December; that was the first time I ever saw it. I never had possession of it in my life. My father paid taxes on it in 1874. I have not got the tax receipt, but I am satisfied that my stepmother has got them. I have never been able to get them. My father told me he paid the taxes that year, but I never saw him pay them, as I was very small then; I think I have seen the tax receipt for 1874. I would not be exactly certain. I saw the receipt and that is what they told me; it was about twenty years ago. My father had no other land in this county. I think he owned this land. I think he lived in this county at this time. I did not read the tax receipt and do not know what was in it, except by what I was told. My father moved to Pemiscot county soon after he bought the land and was in Pemiscot county when he was talking to me about the receipt; I think he moved there in 1872. If there was a tax receipt my stepmother has it and I have tried to get it but she never looked it up and I did not subpoena her as a witness. She lives in Pemiscot county. She

don't exactly claim to have it.    I tried to get her to
find it but she said she could not run across it any-
where.    I failed to get it, but am satisfied that it is
somewhere.    There were tax receipts from 1871
to 1874.    There were more than one tax receipt and
I am describing the latest one that I know for certain.
I think he paid taxes in 1875, but I would not be cer-
tain.    That was about twenty years ago.    He came
from Pemiscot county to pay taxes on this land and
he just quit coming and paying the taxes.    I don't
know anything about his abandonment of the land. He
was talking to me in 1897 and told me that he had a
receipt at home then, but he hadn't paid taxes since
1874 or 1875.    He said that he was not certain that
he paid any in 1875, but thought he did; he knew that
he had the receipt for 1874.    My father lived in Pem-
iscot county from 1872 till last September, when he
died.    I have been in this county since 1884.    I never
claimed this land until last year.    I never paid taxes
on the land because I did not look after my father's
business.    My father claimed to own the land and I
don't know why he didn't pay taxes.    When I saw the
land I found that it was improved.

"David Wilkinson testified in substance as fol-
lows:    I knew James McHenry Campbell all my life.
He stayed at my house all night when coming from
New Madrid county to Pemiscot county, I think in
1873 or 1874.    He said he was coming to pay taxes."

As color of title, the defendant put in evidence
deeds conveying the land as follows:    Deed from Ho-
ratio P. Lynch and wife to Laura W. Smith of date
March 26, 1877; deed, F. M. Sikes and Laura W. Smith
to Otto Kochtitzky of date July 26, 1889, and deed
from Otto Kochtitzky to himself of date February 11,
1901.

He also offered the tax books from 1872 to 1889,

both inclusive, showing that the land went delinquent for the years 1871 to 1889.

Otto Kochtitzky testified thus: That he had been in business in and about New Madrid county, excepting three years, since 1875; formerly lived in the county, but at the time of trial lived at Cape Girardeau; first knew land in dispute in 1886, when he run the north line thereof; in 1889 bought six hundred acres of land of which this forty acres was a part; cut the timber off in 1889 and 1890; made plat of the land in 1891; first paid taxes on the land in dispute in 1889 for the taxes of 1889, and paid them continuously until he sold to Greer; that in 1889 or 1890 he cut the timber off of the ridge running into this forty acres and built a house on the south edge of it; that Singleton cleared the ridge and helped build the house and lived in the house while at work cutting timber and cleared a garden patch of perhaps one acre; when Singleton left the place he turned it over to Klein as a part of the farm and Klein had charge of the forty with the other land; that the forty was in the center of the six hundred and forty acres and Klein had charge of it all; Klein deadened the timber under contract with him in 1892 and 1893; that Klein had possession of the farm until 1898 and had parties living in this house, which house Klein had possession of in connection with the farm; in 1898, other parties occupied the place under agreement with Klein; in 1899 the place was rented to Jerome Hardesty about which time the house was removed; in 1898 the land was fenced and cultivated with a half or two-thirds of the forty in the main field; the house was removed after land was fenced; the land had been cultivated since 1898, and some one had been in possession of this forty under him since 1891 until he sold it; that he claimed the land from the date of his purchase and took possession; the people generally in the neighborhood knew that he claimed the land:

he had known plaintiff since 1887 and sold him other lands for C. L. Luce in 1888, but never knew that he claimed this forty; that he had examined the tax books from 1872 to 1890. His further testimony is set out in the abstract as follows:

"It was assessed to Isaac Hickerson in 1872. It is true that people don't always pay taxes as assessed on the books, but it is assessed to one sometimes and paid by another. The house on this land was built in 1889 or 1890. It was a log house, just a little log hut —a pretty fair house, fourteen by sixteeen, I think. It was built on contract with Singleton to clear land. He was to have the house and build it to suit himself. He tore down an old house in the corner of my field and moved part of the logs there and I furnished the lumber for the floor. It was a little log house with a mud chimney. I know that it was on this forty because I surveyed the land. George Singleton was the first man who lived in it. And he lived in it about a year. I don't know who lived in it in 1891 and don't know the names of the parties who lived in it after 1889. I remember seeing people living in it in the spring of 1895. I dug a ditch across the end of the land at that time. After 1890 until 1895 or the winter of 1894 and 1895 I don't know if anybody was living in that house. There was only a garden patch in cultivation on this land in the spring of 1895 but the timber had been deadened on about two-thirds of the forty but it was not cleared up; for about three years there was not anyone, to my knowledge, living in that house. It was built by agreement with Singleton to lease and clear land, but he did not do it. It was fenced in 1898 and a crop raised on a portion of the land in 1898. I paid for deadening the timber in the spring of 1893. In 1892 I settled with Klein for deadening the timber on that tract of land. I am indirect-

ly a party to this law suit, as I made a warranty deed to this land to Mr. Greer and am interested in that way.

"RE-DIRECT EXAMINATION: In speaking of the first crop made on this land in 1898 I had no reference to the garden that had been raised there in previous years. The garden was used by the people who lived in this small house and was fenced and enclosed and used as a garden.

"RE-CROSS EXAMINATION: I don't know how many years it was used as a garden. When I returned to the State in 1894 I remember seeing a garden fenced and remember just how it appeared and it had been fenced then several years; it had a rail fence about part of it and I think on two sides of it. I am not able to state of my own knowledge whether this house was continuously occupied from the time it was built up to the time of the institution of this suit. It may possibly have been vacant some time."

The evidence given by Thomas Klein is preserved in the abstract thus:

"Thomas Klein testified in substance as follows: I know Otto Kochtitzky and lived on his farm eight or nine years. I know the forty acres of land now claimed by Mr. Campbell. It is a part of the farm that I lived on. It was a part of the tract of land owned by Kochtitzky. I moved there in 1889 and left there in 1898. While I was there I had possession of this forty acres. I reckon I did. Mr. Kochtitzky gave a lease to a fellow and he stayed a year or longer and cleared about an acre and a half, fenced and put a portion in potatoes, paled in a garden, I think, and fixed to clear the land. He lived there during the time they were cutting timber for Duncan on the place and after his contract for cutting timber was through he took a lease from Kochtitzky on the place and built a house there and cleared a patch of land, and stayed there probably a year and a half; then he moved away and

his brother moved there probably a year; then a fellow named Atkinson moved there, but he didn't make a garden or anything. He was clearing for me on the place and stayed there, I think, until he died; then his step-son lived there, I think, three or four months, probably, after his death and worked on the farm for me; then I think there was a fellow named Pate lived there part of a year. I had charge of the property; I had control of the house in connection with the balance of the farm, used it as a tenant house for hands and whatever I saw fit to use it for. Kochtitzky told me to use it in this way and I used it in connection with the balance of that farm, for men living there who worked on the farm. Fellows would come to me to rent it that worked somewhere else and I would not rent it at all. I got it for my own use on that farm and no one ever lived there except with my permission. If I needed a stick of timber for anything I went there to get it and got wood, rail timber, and anything I needed in the way of timber I got off of that land and used it in connection with the farm. There was a pump on this land where that cabin was and I used that pump for water on the farm and at the house. This land was deadened in 1891 or 1892, I think. I left the place in 1898. I had possession of the house from the time it was built and the forty acres of land and when it was necessary and when I needed any timber off of the forty acres I would get it there if convenient and there was no time that I did not have control of it in that way.

"CROSS-EXAMINATION: I lived at Morehouse. Mr. Singleton lived in that house the first year. He was cutting the timber at the time for Duncan who had a contract to get out timber. He then took a lease from Kochtitzky and put the house there. I think he left there in 1892 or 1893. The house was vacant a very short time until his brother moved in and lived there

probably six months or a year; he left in 1893 or 1894 or 1895, I forget about dates. I think George Singleton moved back into the house again; he lived there two different times; I am sure about that. The second time he was probably there five or six months, about 1895, I guess. A fellow named Atkinson moved in then, I think about 1895 and think he moved out about 1896. He lived there four or five months; it was probably vacant a month or two or probably three months when nobody was in it. I think the land was put in cultivation in 1898. There were times after the house was built, for a month or two or three at a time, when the house was vacant. Atkinson last lived there in 1897. He moved out and the place was cleared up and put in a field in 1898. These men living there worked on the farm for me and one thing and another. I don't think they worked for other people.

"RE-DIRECT EXAMINATION: Some one was living in this house every year. Living in the house and working for me on the farm and when the house would be vacant for two or three months I was looking after the house and using the pump and using the forty acres for fire wood and rails as I stated. This forty acres of land is right in the center of Kochtitzky's farm and he owns the land all around it. It had all been fenced by Kochtitzky in 1897; that was the first time that the whole of the forty acres was fenced in. I think Kochtitzky bought the land from two different parties, but at the time I lived there, I guess he owned it all as one body of land, as he said it was his. There was no fence around the forty acres except the garden until 1898, then the whole forty was fenced and put in cultivation. Sometimes there was a man in the house and sometimes it was empty, but I had the right to use it whenever I wanted to and did use it, as Kochtitzky gave me permission to do. When I left the farm there was something near two hundred acres in cultivation."

Plaintiff's evidence in rebuttal is summarized in the abstract in as small a compass as we could give and is given thus:

"Isaac Barnett testified in substance as follows: I know the land in controversy but could not swear that that house was on that forty, but I have seen it many a time. I don't know who built the house, but I know Singleton lived in it the first time I knew anything about it. I have been in that neighborhood more or less and made it my home since 1890. I know that that house was vacant sometimes; I couldn't state what years. The timber was taken off of the land in 1890 and some of the log-men that worked on the land occupied the house at that time and it was considered a part of the logging camp. I know that it was vacant sometime in the last ten years, but can't state when. This forty was cleared and put in cultivation in 1898.

"CROSS-EXAMINATION: Otto Kochtitzky had a large farm there and owned land all around this forty acres, but it was on the south end of the cleared land. I don't know for certain that the house was on the forty acres, but would not state that it was not, but I think it was. I don't know who had it built; I know that Singleton had it built and lived in it. I have known ever since I lived in the neighborhood that Kochtitzky claimed to own that forty and I think everybody else knew it. I never heard it disputed unless less than a year ago. I knew Mr. Klein and he lived on that farm eight or ten years and he kept farm hands in that house and used it in connection with the farm and it has always been used by men that worked on the farm. It was considered on a tract of land that belonged to the farm and it has been considered a part of the farm as far as I know since 1890, and I know that Klein used it the same as he did the other woods land. When the house was vacant Klein then used the forty and the

pump for water and looked after the house just as he did the balance of the farm, and it was considered a part of the property the same as the other land was outside and that was generally understood by the public and the part enclosed was cultivated in farm products. I think there was a little garden where the house was; whether it was on the forty I would not state, but I think in 1890 there was a garden patch raised there and it may have been for other years. I think 1890 was the first. It was fenced in for garden purposes and used from time to time.

"RE-DIRECT EXAMINATION: I think the forty was not fenced until 1898. I think the house was used by men who worked on the farm. I think there was not a garden raised every year. I could not state how long the house was vacant at the time, but I think the house was occupied, according to my recollection, about one-third or possibly one-half of the time since 1890, but when it was vacant Klein used the timber and controlled the premises and it was considered part of the farm.

"Mat. Robinson testified in substance as follows: I know the land in controversy, but don't when the house was built. The first time I knew the house was in 1898, and no one was living in it them. The land was not in cultivation every year, but it was cleared and fenced in 1898. In 1898 Atkinson moved in the house and made a garden there that year. It was vacant before he moved in. I cleared seventeen acres of the forty and the garden spot was a part of it and there was nothing but briars in the garden. It looked like it had been in cultivation the last year or two; corn ridges were there, potatoes or something had been raised. It had not been in cultivation the year before I cleared it.

"CROSS-EXAMINATION: I could not tell how long before that when it had been in cultivation, but I would

not think that the briars would have grown up in one year. I cleared up a part of the forty acres in 1898, which was the first time I noticed the house. That year the land was cultivated in corn. I know Kochtitzky had a large farm there, or claimed it. I paid rent. Everybody knew that he claimed the farm. This forty acres was a part of the farm and he owned land all around it. The year I moved there I rented and made a share crop with Klein and paid Kochtitzky the rent. Klein was the agent for Kochtitzky and rented the land for him. Atkinson did not work for Klein. I believe he worked a couple of days for me, paling a garden spot. Nobody put him in the house, but he just moved there and went to work and made a garden. I don't think he worked for Klein, but I don't know. He paid me two day's work for the use of the garden. I rented to Atkinson. I never rented it from Klein. Klein gave me six dollars an acre and the first crop for clearing the land and that gentleman was in the house, because it would be in the field after it was cleared, I wanted him to get out. He had mowed the briars off the garden and I told him to give me two days work for the garden; I didn't get any right from Klein to the ground; but I got my right on the farm from him, and Atkinson paid me for the garden. I know that the forty acres was by everybody considered a part of the Kochtitzky farm and belonged to the farm, but it was not cultivated until 1898, except the garden spot. There was no fence about the garden spot when I first knew it.''

No instructions were asked or given for plaintiff. For defendant, the court gave the following:

''The court declares the law to be that the fact of non-payment of taxes need not be proven by direct and positive evidence, but it may be inferred from the facts and circumstances bearing upon the question.

''The court declares the law to be that if the de-

fendant and those under whom he claims has been in the open, notorious, continuous, adverse and actual possession of the land in controversy, claiming to own the same, for ten years before the filing of this suit on the 12th day of February,.1903, then the finding should be for the defendant."

And refused to give the following:

"The court declares the law to be that if the title to the land in controversy emanated from the Government more than ten years and that the defendant and those under whom he claims has been in the lawful possession for one year before the institution of this suit and that the plaintiff and those under whom he claims have not paid any taxes on the said land for thirty years prior to February 12, 1903; then the plaintiff cannot recover.

"The court declares the law to be that in order to show actual possession it is not necessary to show that there was any building or enclosure upon the land but such possession may consist of the use of the same for fire wood, rail timber or other purposes in connection with a farm and improvements belonging to the claimant and adjoining the said land, and if the court believes the defendant and those under whom he claims did use the land in this suit for the use of his farm hands and for getting fire wood, rails and other purposes in connection with said farm and improvements belonging to the said party claiming said land then such acts of ownership show actual possession."

The cause being submitted the court sitting as a jury found the issues for the plaintiff and judgment was entered in conformity to such finding. A timely motion for new trial was filed and by the court taken up and overruled and the defendant prosecuted his appeal to this court and the record is now before us for consideration.

### . OPINION.

The record in this cause practically presents but one legal proposition, that is, concerning the action of the court in the refusal of the instruction requested by the defendant upon the thirty-year Statute of Limitations.

In the statement of this cause we have indicated very fully the disclosures of the record respecting the evidence introduced by the parties to this controversy. It is clear that if there was any substantial testimony developed upon the trial of this cause which tended to establish a state of facts which authorized the defendant to invoke the thirty-year Statute of Limitations as is embraced in the provisions of section 4268, Revised Statutes 1899, the defendant was entitled to have the law declared as requested upon that subject. That there was ample testimony upon which to base instruction number 1 on the subject of the thirty-year Statute of Limitation, there can be no question. The undisputed evidence in this cause shows that the father of · plaintiff acquired the title to the property in dispute in the year 1871 by deed from Levi Mayhew and wife. This action was brought to the March term, 1903, of the New Madrid County Circuit Court. It is further disclosed by the evidence as indicated in the record that neither the father of plaintiff nor any person claiming under him ever went into the possession of the land; hence, we have a period of thirty-two years that no claimant under the original ancestor, Campbell, was ever in possession of the land. The issue of the thirty-year Statute of Limitations was sharply presented by the answer of the defendant. He specifically pleaded in the answer such a state of facts as fully conformed to the requirements of section 4268, and the testimony introduced strongly tends to show a state of facts which entitled the defendant to the protection

afforded by the provisions of that section.    It was shown in evidence that the land in dispute went delinquent for taxes from 1872, the year that Campbell purchased, to 1899, and from that time the taxes were paid by the defendant or his grantors.    While it is true that there was an attempt to show the payment of taxes for the year 1874 by James McHenry Campbell, however a careful analysis of the testimony offered to establish that fact will clearly indicate that it was of a very unsatisfactory character and of but little probative force.    The plaintiff says that his father paid the taxes in the year 1874, but later on in his testimony the fact is disclosed that he had no personal knowledge of the payment.    He says that he thought he had seen the tax receipts and that his step-mother has them, but he has been unable to get them.    Testimony of this character in the face of the fact that the tax-books show the land delinquent for the years '72 to '79 inclusive is at least unsatisfactory.    It may also be added that when the testimony as offered by the plaintiff upon the question of the payment of taxes for the year 1874 is fully considered, it is manifest that much of that testimony was incompetent and on proper objections to its introduction should have been excluded.    However, we shall not undertake to discuss the weight of the testimony in this proceeding, but we are simply pointing out the nature and character of it and indicating upon some of the propositions where it is unsatisfactory.    We are unable to surmise as to what may be the showing made by the plaintiff upon the retrial of this cause. The weak points in the testimony as herein suggested may upon another trial be fully corrected.

We have as disclosed by the record this statement of facts upon which the defendant could very properly predicate his request for the declaration of law as embraced in instruction number 1.    Beginning with April 26, 1871, that being the date upon which James Mc-

Henry Campbell acquired title to the land in dispute, the full period of thirty years had expired, and during that period there was no possession either by the plaintiff or his grantors, and there was no payment of taxes except the disputed payment of taxes in 1874. That dispute must be settled in another trial of this cause. It also appears that not only had the thirty years expired without any possession, but in addition the one year allowed thereafter by the statute in which to bring the suit, had also expired prior to February 12, 1903, the date mentioned in the instruction.

Under the provisions of section 4268 it is essential that the period of thirty consecutive years must expire in which there has been no possession and no payment of taxes, and commencing from the expiration of such thirty-year period, the claimant then has one year in which to bring his suit, and in the event there is a failure to bring the action within the next succeeding thirty years period aforesaid, then the title vests *ipso facto* in the party who has the lawful possession. In other words, while we denominate this statute a thirty-year Statute of Limitation, it really requires 31 years for the title to vest.

The record in this cause clearly discloses that the period of 31 years had expired without any possession and that the defendant could successfully invoke the provisions of the section as herein suggested, applicable to the thirty-year Statute of Limitation, unless it should be made to appear that there was a payment of taxes in 1874.

It is manifest from the record before us that the title to the land in dispute had emanated from the United States Government in 1850, and it also appears that the defendant had been and was in the lawful possession of the land for more than a year after the expiration of the thirty-year period. He and his grantors had claimed the title to this land for more than ten

years. The provisions of section 4268 apply to legal as well as equitable titles which have emanated from the Government. [Collins v. Pease, 146 Mo. 135.]

It is insisted by learned counsel for respondent that there was evidence upon which the trial court could predicate its finding that a payment of taxes was made for the year 1874, and that this court should not undertake to retry that issue upon the testimony disclosed by the record and disturb that finding. That counsel states the true rule applicable to the review of cases in the appellate courts, that is, that where there is substantial evidence to support the finding of a jury or the court sitting as a jury, this court will not undertake in any way to interfere with such finding. However, it is manifest that that does not answer the propositions involved in this proceeding. Here we have a state of facts which fully justify the request for the declaration of law embraced in instruction number 1 and the court refuses to declare the law as requested, which was applicable to the issues in the cause. Even though its finding upon any particular issue may have had sufficient evidence to support it, yet the refusal of a proper instruction applicable to the issue sharply presented by the pleadings and upon a state of facts developed at the trial which fully warranted it, can only be treated as an erroneous conception of the law which was applicable to the facts developed in the case.

Instruction number 1 refused by the court properly declared the law as applicable to the facts developed at the trial, and its refusal constitutes error, for the reason that the refusal to give the instruction indicates that the court did not in the consideration of the facts undertake to consider such facts in view of the law applicable to them. In other words, if the trial court had fully recognized the law as declared in instruction

number 1 requested by the defendant, the conclusion reached might have been entirely different.

We repeat that this court is unable to surmise as to what the testimony upon the ten-year and thirty-year Statute of Limitations will develop in a new trial of this cause; however, upon the testimony as disclosed by the record in this trial, in our opinion, if the testimony is credible, it practically reaches the quantum of proof required by the law to show adverse possession under the ten-year Statute of Limitations. However, upon a retrial the facts may be stronger one way or the other upon this question, and doubtless the good judgment of the learned trial judge will deal properly with such facts when they are presented.

With the views we entertain upon the legal propositions disclosed by the record upon which we have herein given expression, it results that the judgment of the trial court should be reversed and the cause remanded, and it is so ordered.

All concur.